**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KATHY H. QUAVE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:05-CV-1300-P (BH)** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of Title 28, United States Code, § 636(b), and the District Court's *Order of Reference*, filed July 25, 2005, this matter has been referred to the United States Magistrate Judge for report and recommendation. Before this Court are *Plaintiff's Brief*, filed November 10, 2005; and *Commissioner's Motion for Summary Judgment* and *Defendant's Memorandum in Support of Motion for Summary Judgment and Response to Plaintiff's Brief*, filed December 22, 2005. Plaintiff did not file a reply. Having reviewed the evidence of the parties in connection with the pleadings, the undersigned recommends that Plaintiff's motion for summary judgment be **GRANTED**, *Commissioner's Motion for Summary Judgment* be **DENIED**, and the decision of the Commissioner be **REVERSED**.

# BACKGROUND[1]

## A.    Procedural History

Kathy H. Quave ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Title II of the Social Security Act.  Plaintiff filed an application for disability benefits on August 1, 2002.  (Tr. at 91-93).  Plaintiff alleged that she became disabled on October 1, 1999, due to peripheral vascular disease, arthritis, pain, depression, and bone spurs on her spine.  (Tr. at 111, 118).  Plaintiff's application was denied initially and upon reconsideration.  (Tr. at 24, 32).  Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).  (Tr. at 38).  A hearing, at which Plaintiff personally appeared and testified, was held on October 12, 2004.  (Tr. at 293-338).  On December 23, 2004, the ALJ issued her decision finding Plaintiff not disabled.  (Tr. at 9-19).  After considering additional evidence, the Appeals Council denied Plaintiff's request  for review on April 28, 2005, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision.  (Tr. at 4-6).  Thus, the ALJ's decision became the final decision of the Commissioner.  (Tr. at 4).  Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) on June 24, 2005.

## B.    Factual History

### 1.    *Age, Education, and Work Experience*

Plaintiff was born January 19, 1956.  (Tr. at 91).  At the time of the hearing before the ALJ, she was 48 years old.  (Tr. at 297).  She graduated from high school and attended junior

---

[1]  The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

college for one year. (Tr. at 117). Her past relevant work experience included work as a sales clerk. (Tr. at 112, 333).

### 2. Medical Evidence

On May 9, 1992, Plaintiff underwent back surgery for a slipped disk at the L3-4 and L4-5 levels. (Tr. at 169-72). The operating surgeon, Dr. Craig R. Duhon, M.D., was assisted by Dr. Steven G. Bander, D.O. (Tr. at 171). Roughly three weeks after the surgery Dr. Duhon noted that Plaintiff "continues to experience occasional pain along the lateral aspect of the left lower leg, but she is much improved." (Tr. at 163.) Eight weeks after the surgery, Dr. Duhon noted that Plaintiff "continues to experience occasional lower back pain; however, she has noted improved strength in the left leg." *Id.*

The next medical record dates from April 28, 1995. (Tr. at 187). On this date, Dr. Bander noted that Plaintiff had been dieting and that her current weight was 235 1/4 pounds. *Id.* He also noted that Plaintiff was seeing a psychiatrist[2] and was taking the antidepressant Wellbutrin which "seem[ed] to be working extremely well." *Id.* Dr. Bander stated his impression that Plaintiff had "peripheral vascular disease, severe arthritis, malaise, and possible borderline hypertension." *Id.* Plaintiff subsequently saw Dr. Bander on May 15, 1995, and June 21, 1995; both check-ups resulted in Dr. Bander recording similar impressions to those of the April 28, 1995 meeting. (Tr. at 186). The medical record suggests that Dr. Bander prescribed or refilled medication seven additional times during 1995. (Tr. at 185).

On May 23, 1996, Plaintiff saw Dr. Bander and was diagnosed with intractable Dysfunctional

---

[2] Plaintiff's disability application, filed August 1, 2002, lists Richard Roskos, 6060 N. Central Expwy, Dallas, TX as her psychiatrist. (Tr. at 118). However, there are no records of treatment by Dr. Roskos or any other psychiatrist in the transcript.

Uterine Bleeding ("DUB"). (Tr. at 177). On June 15, 1996, Dr. Bander noted that Plaintiff was weak and anemic; her body weight was recorded at 230 lbs. (Tr. at 284). Dr. Bander noted that Plaintiff had a total hysterectomy sometime during the year of 1996, although the full record of that surgery does not appear in the transcript. (*See* Tr. at 266). The next recorded meeting with Dr. Bander was on December 19, 1996. (Tr. at 278). Dr. Bander noted that Plaintiff had gained 25 pounds in the last six months and that she presently weighed 255 pounds. *Id*. He also noted that Plaintiff had not been going to physical therapy and that she complained of intractable bilateral hip and foot pain. *Id*. Dr. Bander recorded his impression of "anemia, peripheral vascular disease, intractable polyarthralgias, morbid obesity, and hyperlipidemia."[3] *Id*.

Plaintiff again saw Dr. Bander on September 17, October 17, and October 31 of 1997, for treatment of a deep knee wound and infection. (Tr. at 271). This infection was slow to heal and was still swollen - although improved - when Plaintiff next saw Dr. Bander for severe arthritis pain on January 19, 1998. (Tr. at 269). By the time of this appointment, Plaintiff had gained another 25 pounds and her weight was recorded at 280 pounds. *Id*. Over the next eight months, Dr. Bander apparently prescribed medication to Plaintiff on seventeen separate occasions. (Tr. at 268-69).

On September 15, 1998, Plaintiff again saw Dr. Bander for severe arthritis pain. (Tr. at 266). Dr. Bander noted his impression of "severe arthritis, family history of osteoporosis, and chronic pain." *Id*. Over the next two and a half months, Dr. Bander prescribed additional medication four times. *Id*. Plaintiff again saw Dr. Bander on December 1, 1998, complaining of rib pain. (Tr. at

---

[3] Polyarthralgias is pain in the joint. Hyperlipidemia is an excess of lipids in the blood. MEDICAL DICTIONARY ONLINE, *available at* http://www.online-medical-dictionary.org (last visited Aug. 14, 2007).

265). The doctor recorded his impression of "costochondritis,[4] and eczema exacerbation." *Id*. Dr. Bander recorded Plaintiff's weight at 281 pounds. *Id*. Over the next eleven months, Dr. Bander prescribed or refilled Plaintiff's medication on twelve occasions. *Id*.

On October 16, 1999, Plaintiff took an ambulance to the Lake Pointe Medical Center emergency room for back pain after a fall. (Tr. at 222-23.) The examining physician noted that Plaintiff had "morbid obesity" and a tender spine. (Tr. at 223.) The doctor prescribed a variety of pain medications, which Plaintiff refused because she stated she felt better and did not need more pain medication. *Id*. She was discharged the same day under an "improved" condition. *Id*.

Plaintiff next saw Dr. Bander on November 2, 1999, for a complaint of persistent low back pain. (Tr. at 264). Dr. Bander noted Plaintiff's long history of back problems and her inability to regularly afford all of her medications. *Id*. Dr. Bander observed tenderness in Plaintiff's lower back, but he was unable to do a full exam because Plaintiff experienced pain when she tried to lay down on the examination table. *Id*. Dr. Bander recorded Plaintiff's weight at 299 pounds. His impressions were "malaise progressive, low back pain, arthritis, and ASHD [arteriosclerotic heart disease]." *Id*.

Plaintiff returned to Dr. Bander on January 17, 2000, with complaints of back pain. (Tr. at 262). He noted that the pain in her lower back radiated into her right leg and that she weighed 300 pounds. *Id*. He stated that Plaintiff was "walking with a cane, but that is her usual status." *Id*. He also wrote that although Plaintiff injured her back, she drove twelve hours the following day. *Id*. Dr. Bander's impression was "lumbar sprain" and prescribed medication for the pain. *Id*.

---

[4] Costochondritis is an inflammation of a rib or the cartilage connecting a rib. Benjamin W. Van Voorhees, *Costochondritis*, MEDICAL ENCYCLOPEDIA (2006). *Available at* http://www.nlm.nih.gov/medlineplus/ency/article/000164.htm (last visited Aug. 15, 2007).

On April 4, 2000, Plaintiff visited Dr. Bander because of low back pain that started on March 31, 2000. (Tr. at 260). Dr. Bander wrote that Plaintiff weighed 303 pounds and that she had "exquisite tenderness of the lumbar area at L3 and 4." *Id*. He also stated that Plaintiff was "ambulatory only with a cane and [was] having significant difficulty while walking. Its [sic] extremely hard for her to get out of a chair and very hard to get out of a bed" *Id*. Dr. Bander's impression was "acute exacerbation of lumbar sprain and radiculitis in the right leg." *Id*. An MRI performed on April 5, 2000, did not find evidence of a herniated disk or a pinched nerve, although it did detect bilateral L4 neuroforaminal narrowing due to end plate spurs and annular bulging, L4-5 and L5-S1 degenerative facet arthropathy, and severe T11-12 degenerative disk disease. (Tr. at 258-59.)

Eight days later, on April 12, 2000, Dr. Bander examined Plaintiff and found "significant soreness in her right SI [sacroiliac] joint with an exquisitely tender trigger point on palpation." *Id*. He noted that her "back overall is improved;" that she had some "facet arthropathy and spur with some mild foraminal narrowing and an annular bulge at L4-5;" that she weighed 300 pounds; and that her exam was "otherwise unremarkable." *Id*. Dr. Bandar's impression was persistent but improving lumbar pain, and right SI tenderness with trigger point. *Id*. Dr. Bandar gave Plaintiff a trigger point injection of the right SI joint, which resulted in improvement within two minutes. *Id*. Dr. Bandar prescribed or refilled medication four times in the next four months and saw Plaintiff again on September 20, 2000. (Tr. at 254, 257). At this time, Plaintiff complained of pain in her right ribs and weighed 308 pounds. (Tr. at 254.) Dr. Bander recorded his impression of "costochondritis, arthritis, and ASHD." Dr. Bander prescribed medication four times in the next four months. (Tr. at 253).

Plaintiff again saw Dr. Bander on May 4, 2001. *Id.* She complained of "back pain, aching all over" and pain in her wrists and knees. *Id.* She reported that she was out of her medication and was unable to afford steroid shots. *Id.* Dr. Bander recorded Plaintiff's weight at 306 pounds, noted that she was 5'6" tall, and diagnosed her with arthritis. *Id.*

On June 30, 2003, Lesa Walker, a nurse practitioner at Dr. Bandar's clinic, wrote a letter to the Garland, Texas, office of the Texas Rehabilitation Commission. Nurse Walker stated that Plaintiff was "unable due to rheumatological problems to sit for hours at a time. She is unable to do lifting, walking, weight bearing jobs as well." (Tr. at 242). However, an August 5, 2003 letter from Dr. Alan Brodsky, M.D. at the Arthritis Care & Diagnostic Center in Dallas, Texas, stated that examination results for two measures of inflammation were only "mildly elevated." (Tr. at 225.) Dr. Brodsky also noted a positive ANA test, which he noted could indicate an autoimmune or inflammatory disorder. *Id.* However, he said that Plaintiff's examination results did not support a diagnosis of Lupus, rheumatoid arthritis, or other conditions. *Id.* Dr. Brodsky recommended symptomatic treatment, water exercise, and muscle relaxants to treat Plaintiff's chronic low back pain. *Id.*

On February 2, 2005, subsequent to the ALJ's decision and prior to the Appeals Council decision, Dr. Bander submitted a letter summarizing Plaintiff's major medical problems and opining that Plaintiff "is reduced to walking with assisted device and is unable to work due to the debilitating nature of the arthritis disease." (Tr. at 291).

### 3. *Hearing Testimony*

At the October 12, 2004 hearing, the ALJ heard testimony from Plaintiff, a witness, a medical expert, and a vocational expert. (Tr. 295-338).

### a.    Plaintiff's Testimony

Under examination by her attorney, Plaintiff testified that she was 48 years old, that she was married, and that she did not have any children under the age of 18.  (Tr. at 297).  She last worked in 1999 as a sales clerk at a teacher's supply store, a position she held for approximately eight years.  (Tr. at 298).  She said that she stopped working because she was no longer able to do her job.  *Id.*  Prior to her work at the teacher's supply store, she worked as a sales clerk for two to three years at a florist.  (Tr. at 298-99).

Plaintiff testified that she had back surgery in 1992; the surgery eased her back problems for a period of time, but in 1997 or 1998, her back pain returned.  (Tr. at 299-300).  These problems included pain, poor circulation, and swollen legs and feet.  (Tr. at 300).  Plaintiff testified that she took several medications that alleviated but did not dispel her pain.  (Tr. at 300-01).  She relied on a cane for support.  (Tr. at 301-02).  She told her attorney that in addition to back pain, she suffers from peripheral vascular disease, arthritis, bone spurs, and depression.  (Tr. at 302-04).  Plaintiff said she took Wellbutrin for her depression, which "helps a lot."  (Tr. at 303).

At the time of the hearing, Plaintiff said she spent her day embroidering, working on genealogy, making crafts, cooking, and performing housework.  (Tr. at 304).  Plaintiff testified that on her best days she was able to do these activities for an hour at a time before needing to lie down.  (Tr. at 304-05).  Plaintiff's housework included washing dishes, sweeping, cooking, and laundry.  (Tr. at 305).  However, Plaintiff said that the meals she cooked involved minimal preparation because she could not stand for long periods of time and that her washer and dryer are elevated on blocks for easier access.  (Tr. at 305-06).  Plaintiff used to be very active in her church but no longer attended services.  (Tr. at 307-07).  She testified that she visited homebound members of her

congregation approximately once a month.  (Tr. at 307).

Under examination by the ALJ, Plaintiff testified that she drove herself to the hearing and that with the aid of medication she slept approximately four hours per night.  (Tr. at 311-12).  She said that her embroidery work was done by hand and that she did not have any problem with fine manipulation.  (Tr. at 313-14).  Her genealogy work involved using a laptop, and she was able to work on it for approximately an hour before needing a break.  (Tr. at 314-15).  Plaintiff said that she ironed shirts and that she could probably iron for 45 minutes before needing to sit down.  (Tr. at 315).  Plaintiff also told the ALJ that she enjoyed gardening.  (Tr. at 316).  Plaintiff estimated that the heaviest weight she could lift was around 5-10 pounds, although repetition made her condition worse.  (Tr. at 318).  She said that she had difficulty bending and walking and that she did not exercise.  (Tr. at 319).

### b.    Witness Testimony

The ALJ also heard testimony from Sally Hankins, a friend of Plaintiff for approximately twenty years.  (Tr. at 307).  She had seen Plaintiff frequently during that period, and at the time of the hearing she lived about five blocks away.  *Id*.  According to Ms. Hankins, Plaintiff was in "bad shape" when she finally quit work in October of 1999.  (Tr. at 308).  Ms. Hankins said that Plaintiff could do a given activity for "an hour or two at the most" before needing to rest.  (Tr. at 311).

### c.    Medical Expert Testimony

Dr. Homer Reeves, M.D., a family practice physician, testified as the medical expert ("ME").  (Tr. at 322).   After reviewing the record, the ME opined that Plaintiff had "degenerative disk disease of the lumbar spine and some degenerative changes in the thoracic spine."  (Tr. at 323).  He also testified that Plaintiff was obese, although he did not find any circulatory problem in the

medical record and no record of a diagnosis of peripheral vascular or venous arterial disease. *Id*.

The ME rated the spinal problems as severe; he also noted that Plaintiff had been prescribed no

assistive devices and that Plaintiff had recorded an 80 pound weight gain since 1996. *Id*. When

asked by the ALJ to indicate the time at which Plaintiff's condition reached the severity described,

the ME stated that the record did not show "any significant ongoing problems until 1/17/2000 when

she reportedly injured her back." (Tr. at 324). Based on these findings, the ME stated that Plaintiff's

problems did not reach "a level of a listing or an equivalence." *Id*. The only work restrictions the

ME thought necessary were sedentary work with a sit stand option and limits on stooping, ladder

climbing, and extensive balancing. (Tr. at 325).

Under questioning from Plaintiff's attorney, the ME agreed that Plaintiff had reported

significant ongoing problems prior to January 17, 2000. (Tr. at 326-28). The ME also agreed that

Plaintiff was only ambulatory with the help of a cane. (Tr. at 329). The ME reiterated his belief that

Plaintiff could perform sedentary work with a sit/stand option at hourly intervals. (Tr. at 331).

### d. *Vocational Expert*

Next, Tammy Donaldson testified as the vocational expert ("VE"). (Tr. at 332). The VE

testified that Plaintiff's previous work experience as a sales clerk was classified as light, semi-

skilled, with an SVP (specific vocational preparation) of three. (Tr. at 333). The VE stated that over

the past 15 years, Plaintiff had worked one job at two different locations. *Id*.

The ALJ then posed a hypothetical question to the VE. *Id*. The question considered the

employment opportunities for a hypothetical person with Plaintiff's age, educational background,

and work experience with the following additional restraints: the hypothetical person could not

carry more than 10 pounds, walk more than 6 hours in an 8 hour day, sit for more than 6 hours in

an 8 hour day (with interruptions), and could not climb, crouch, kneel, or stoop. *Id*. The individual could push, pull, finger, feel, and handle "occasionally." *Id.* Further, the individual would be restricted to work that allowed her to sit and stand freely at one hour intervals. *Id*. Based on this profile, the VE testified that such a person would not be capable of performing Plaintiff's past relevant work as a sales clerk because of the hypothetical person's inability to lift more than 10 pounds. (Tr. at 333-34). When the ALJ asked whether Plaintiff had any transferrable skills, the VE responded that Plaintiff had none. (Tr. at 334).

When the ALJ asked if there were other jobs in the national or regional economy that the hypothetical person could perform, the VE testified that "[s]edentary work generally requires good bilateral dexterity, which includes handling and fingering generally speaking to the frequent to constant level." (Tr. at 334). Because the ALJ imposed the restriction of "occasional" on the hypothetical person's ability to push, pull, finger, feel, and handle, Plaintiff's ability to perform sedentary work was limited to the extent that there was a "significant erosion in the job base." (*See* Tr. at 333-34). The limitation of "occasional" eroded the job base to "only" two examples of jobs. (Tr. at 334). The first job was a call out operator, which the DICTIONARY OF OCCUPATIONAL TITLES ("DOT") listed as entry number 237367014 and classified as sedentary, unskilled, with an SVP of 2. (Tr. at 335). The VE testified that there were approximately 11,000 jobs in the national economy and 800 such jobs in Texas. *Id*. The second job was that of a surveillance systems monitor, which the DOT listed as entry number 379367010 and classified as sedentary, unskilled, with an SVP of two. *Id*. The VE testified that there were approximately 33,000 jobs in the national economy and 2,300 jobs in Texas. *Id*.

Plaintiff's attorney then questioned the VE. When he asked whether the position of call out

operator required Plaintiff to sit all day, the VE responded that it did not; rather, it was a true sit stand option but did require an attachment to a headset near the desk as well as keyboard typing to record the telephone conversations. (Tr. at 336). Plaintiff's attorney then asked the VE about the duties of a surveillance systems monitor. *Id.* The VE responded that the job duties associated with that position required an employee to monitor business and home security systems and call 911 dispatchers when necessary. (Tr. at 336-37). The VE testified that the job required attentiveness; the VE also testified that an individual on narcotic pain medication might not be able to concentrate to the extent that it would be difficult to perform the requirements of the position. (Tr. at 337).

## C.    Summary of ALJ's Findings

The ALJ denied Plaintiff's application for benefits in a written opinion issued on December 23, 2004, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. at 9-19). Using the five-step process required by 20 C.F.R. § 404.1520, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 1, 1999. (Tr. at 13; Tr. at 18, ¶2). After reviewing the medical transcript, the ALJ concluded that Plaintiff had degenerative disc disease of the lumbar spine and thoracic spine and obesity; although these impairments were "severe" within the meaning of the Regulations, they were not severe enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. (Tr. at 15; Tr. at 18, ¶¶3, 4).

The ALJ then considered Plaintiff's symptoms (including pain), objective medical evidence, and medical opinions to evaluate Plaintiff's residual functional capacity ("RFC"). The ALJ found that Plaintiff's allegations of depression were not supported by the evidence. (Tr. at 16). The ALJ found, based on Plaintiff's testimony about her daily activities, that her physical impairments did

not preclude basic work activities and that allegations regarding her limitations were not totally credible.  (Tr. at 16; Tr. at 18, ¶5).  The ALJ determined that Plaintiff had the following RFC: lift/carry 10 pounds occasionally, and less than 10 pounds frequently; stand/walk 6 hours in an 8-hour day; sit for 6 hours in an 8-hour day with a sit/stand option (at will or at 1 hour intervals); pushing/pulling occasionally; fingering/feeling/handling occasionally; and no climbing.  (Tr. at 18, ¶6).  The ALJ found that Plaintiff was incapable of performing her past relevant work as a sales clerk.  (Tr. at 17; Tr at 18, ¶7).

Having determined that Plaintiff could not return to her previous work, the ALJ considered whether Plaintiff could perform other jobs existing in significant numbers in the national economy.  (Tr. at 17).  The ALJ classified Plaintiff as a "younger individual" with more than a high school education.  (Tr. at 18, ¶¶8, 9).  The ALJ found that Plaintiff had no transferrable skills from any past relevant work.  (Tr. at 19, ¶10).  The ALJ then determined that Plaintiff could perform a significant range of sedentary work.  (Tr. at 19, ¶11).  Examples of jobs that Plaintiff could perform were call out operator (with 800 jobs in Texas and 11,000 in the national economy) and surveillance system monitor (with 2,300 jobs in Texas and 33,000 in the national economy).  (Tr. at 19, ¶12).  Accordingly, the ALJ determined that Plaintiff was not under any disability as defined in the Social Security Act at any time through the date of her decision.  (Tr. at 19, ¶13).

## II.  ANALYSIS

### A.  Legal Standards

#### 1.  *Standard of Review*

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-344 (5th Cir. 1988).

## 2. *Disability Determination*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be

disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.    Issues for Review**

Plaintiff presents the following issues for review:

(1)    Whether the ALJ properly evaluated the medical evidence;

(2)    Whether the ALJ properly evaluated Plaintiff's credibility; and

(3)    Whether it was established, through the testimony of the VE, that work existed in significant numbers in the national economy that Plaintiff could perform.

(Pl. Br. at 1).

## C.   Issue One: Proper Evaluation of the Medical Evidence

Plaintiff argues that the ALJ's analysis did not properly consider her obesity in conjunction with her back problems, and that a proper analysis should entitle Plaintiff to a finding of equivalence.  (Pl. Br. at 10-11).  As such, Plaintiff argues that there is not substantial evidence to support the ALJ's decision on Plaintiff's obesity claim.  (Pl. Br. at 11).

According to Social Security Regulations, obesity is not itself a listed impairment; it can, however, reduce an individual's occupational base for work activity in combination with other ailments. *See Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity*, SSR 02-1p, 2000 WL 628049 (S.S.A. Sep. 12, 2002).[5]  The National Institutes of Health created parameters, which are relied upon in the Social Security Regulations, for measuring three levels of obesity based on a Body Mass Index (BMI).  (*Id*. at *2).  Level I obesity includes BMIs of 30.0 to 34.9; Level II includes BMIs of 35.0 to 39.9; Level III, also known as "extreme" obesity, includes BMIs greater than or equal to 40.[6]  *Id*.  These classifications "describe the extent of the obesity, but they do not correlate with any specific functional loss."  *Id*.

Rather than determining a specific functional loss, obesity is a factor to be considered in the

---

[5] SSR 01-2p states, "Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems. It commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems.  Obesity increases the risk of developing impairments such as type II (so-called adult onset) diabetes mellitus-even in children; gall bladder disease; hypertension; heart disease; peripheral vascular disease; dyslipidemia (abnormal levels of fatty substances in the blood); stroke; osteoarthritis; and sleep apnea."  2000 WL 628049, at *3.

[6] An individual with a BMI of 18.5 to 24.9 is classified as having a "normal weight."  An individual with a BMI of 25 to 29.9 is classified as "overweight."  NATIONAL HEART LUNG AND BLOOD INSTITUTE, *Calculate Your Body Mass Index*.  *Available at* http://www.nhlbisupport.com/bmi/ (last visited Aug. 16, 2007).  At the time of the hearing, the ME testified that Plaintiff had a BMI of 46.  (Tr. at 323).

sequential evaluation process. (*Id*. at *3). At Step 2, "obesity is a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." (*Id*. at *4). No specific level of weight, BMI, or descriptive term establishes whether obesity is a "severe" impairment for disability purposes. *Id*. At Step 3, obesity may be a factor in both the "meets" and "equals" determinations of whether a claimant has a disability listed in Appendix 1. (*Id*. at *5). "[A]n individual with obesity 'meets' the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing." *Id*. A listing in Appendix 1 can also be met through equivalence, which will be found "if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment." *Id*. However, the Commissioner "will not make assumptions about the severity or functional effects of obesity combined with other impairments;" each case is evaluated based on the information in the record. (*Id*. at *6). At Steps 4 and 5, the Commissioner must consider the effect of obesity on an individual's RFC. *Id*. The inquiry into the effect of disability on a claimant's disability status must be made in light of the cumulative effect of all impairments. *See Loza v. Apfel*, 219 F.3d 378, 399 (5th Cir. 2000).

In the instant case, Plaintiff summarily asserts that the ALJ should have found an equivalence of disability at Step 3 because of her obesity and back problems.[7] (Pl. Br. at 11). In her decision,

---

[7] The Court notes that Plaintiff failed to specifically allege obesity as a disability justifying an award of benefits; instead, she alleged that she was disabled due to peripheral vascular disease, arthritis, pain, depression, and bone spurs on her spine. (Tr. at 111, 118). Defendant does not address Plaintiff's failure to allege obesity as a cause of disability. *See* Def. Br. at 3-4. Nevertheless, the Court will address the cumulative impact of Plaintiff's obesity because the ALJ independently acknowledged that obesity should be considered with other impairments. *See Beck v. Barnhart*, 205 Fed.Appx. 207, 212 (5th Cir. 2006) (ALJ properly considered the cumulative effects of obesity even though claimant did not allege obesity as a cause of disability).

the ALJ twice noted Plaintiff's weight while reviewing the medical transcript. (*See* Tr. at 14-15). The ALJ relied on Plaintiff's own testimony and the opinions of her treating and examining physicians when she considered both Plaintiff's degenerative back disease and her obesity to be "severe" impairments according to the requirements of 20 C.F.R. § 404.1520. (Tr. at 18, ¶3). Nevertheless, the ALJ found that these two medically determinable impairments do not meet or equal one of the listed impairments in Appendix 1. (Tr. at 18, ¶4). Plaintiff presents no argument, and identifies no evidence in the record, to show how the combination of back problems and obesity were disabling. Moreover, although Plaintiff's treating and examining physicians frequently recorded her weight, not once did they state that her obesity exacerbated her back problems or contributed to her allegations of physical impairments. (*See e.g.*, Tr. at 187, 223, 253-54, 260, 262, 264-65, 269, 278, 284).

Based on the medical evidence in the record, the Court finds that substantial evidence supports the ALJ's determination that the combination of Plaintiff's severe impairments, including her obesity, did not meet or medically equal one of the listed impairments in Appendix 1.[8] *Leggett*, 67 F.3d at 564; SSR 02-1p, 2000 WL 628049, at *6.

**D.      Issue Two: Plaintiff's Credibility**

Plaintiff next argues that the ALJ did not consider all seven factors in SSR 96-7p to assess her credibility and, as a result, her credibility was not properly determined. (Pl. Br. at 13-14) (citing *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims:*

---

[8]  Although Plaintiff did not present the ALJ's consideration of obesity at Steps 4 and 5 of the sequential evaluation process as an issue for review, the Court notes that the ALJ factored Plaintiff's obesity into her assessment of Plaintiff's RFC. The ALJ found that Plaintiff could perform a significant range of sedentary work with specific exertional limitations. (Tr. at 18-19, ¶¶ 6, 11). The determination of Plaintiff's RFC was in accord with the ME's opinion who testified that Plaintiff suffered from severe obesity and back problems but could still perform "sedentary work with a sit stand option." (Tr. at 323-26).

*Assessing the Credibility of an Individual's Statements*, SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996)).  Plaintiff does not specify which of the seven factors were not properly considered.  (*See* Pl. Br. at 12-13).

Credibility determinations by an ALJ are entitled to deference.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir.1991).  Nevertheless, the ALJ's "determination or decision [regarding credibility] must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2.  To shed light on an individual's credibility, Social Security regulations provide a non-exclusive list of the following seven relevant factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms;(3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back...); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms."  (*Id*. at *3).

In the instant case, the ALJ expressly considered all available evidence, including Plaintiff's own testimony, when evaluating Plaintiff's credibility.  (Tr. at 16).  The ALJ noted that although Plaintiff may have received medication for her alleged depression, she never sought treatment from a mental health care professional.  (Tr. at 16).  The ALJ also observed that no physician indicated that Plaintiff was completely unable to work.  *Id*.  The ALJ considered Plaintiff's daily activities,

which included cooking, ironing, light housework (including washing and drying laundry), embroidery, craft projects, reading, using a laptop computer, and visiting housebound or sick members of her church. (Tr. at 16, 304-06, 311-16). Based on the medical evidence and Plaintiff's testimony, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints about her limitations were not completely credible. *Leggett*, 67 F.3d at 564; *see* Tr. at 18, ¶5. Moreover, as required by SSR 96-7p, the ALJ's determination contained specific reasons supported by the evidence in the case record for the finding on credibility. *See* 1996 WL 374186, at *2; *see* Tr. at 16.

Plaintiff argues that the ALJ did not analyze all the factors under SSR 96-7p when evaluating her credibility. (Pl. Br. at 13). However, she does not specify which factors the ALJ failed to consider, nor does she cite any case law holding that such a failure constitutes reversible error. *See id*. The Fifth Circuit has not specifically addressed whether an ALJ is required to consider all seven of the factors listed in SSR 96-7p.[9] It has, however, explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints of pain. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). Other courts that have considered the issue have found that an ALJ is not required to expressly address all seven factors listed in SSR 96-7p. *Cross v. Commissioner of Social Security*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) ("[t]he ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure

---

[9] In a case where a claimant appealed a denial of benefits based on the ALJ's failure to apply two out of the seven factors, the court affirmed the decision of the ALJ and found the omission to be harmless. *Nall v. Barnhart*, 78 Fed.Appx. 996, 998 (5th Cir. 2003) ("The ALJ applied five of the seven listed factors in his analysis. Any failure to apply the remaining two constitutes harmless error as Nall has not alleged that they apply to his condition.") In another case, the claimant appealed based on the fact that the ALJ did not explore each of the seven factors; the court, however, affirmed the ALJ's decision and found that the record indicated that the seven factors had been implicitly considered. *Espinoza v. Barnhart*, 66 Fed. Appx. 524, 2003 WL 21017084 (5th Cir. 2003) ("Although the decision of the ALJ does not explore each of the seven factors listed in SSR 96-7p, the record demonstrates that the ALJ considered those factors").

a reviewing court that he or she considered all relevant evidence"); *Blom v. Barnhart*, 363 F.Supp.2d 1041, 1055 (E.D. Wis. 2005) ("[w]hile SSR 96-7p does not require the ALJ to analyze and elaborate on each of these seven factors when making a credibility determination, the ALJ must sufficiently articulate her assessment of the evidence"); *see Canales v. Barnhart*, 308 F.Supp.2d 523, 527-28 (E.D. Pa. 2004) (finding a lack of substantial evidence because (1) the ALJ only examined one of the seven factors; (2) medical evidence supported the claimant's limitations; and (3) the ALJ did not pose hypothetical questions to the VE). In light of these cases, which the Court finds persuasive, and consistent with the Fifth Circuit's rejection of the requirement that an ALJ "follow formalistic rules", the Court finds that the ALJ was not required to separately evaluate each of the seven factors identified by SSR 96-7p. Any requirement to consider all factors of a non-exclusive, illustrative list would impose a formalistic rule on an area in which ALJs are given great deference. *See Carrier*, 944 F.2d at 247; *see Falco*, 27 F.3d at 164.

Even assuming that the ALJ's failure to address all seven factors was erroneous, such failure was harmless. The ALJ considered all relevant evidence and articulated her reasons for discounting Plaintiff's credibility. *Cross*, 373 F.Supp.2d at 733; *Blom*, 363 F.Supp.2d at 1055. Furthermore, Plaintiff did not allege specific factors listed in SSR 96-7p as they apply to her case. Accordingly, she has not shown that she was prejudiced.

**E.      Issue Three: Work That Exists in Significant Numbers**

Plaintiff's third and final issue for review is that a total of 3,100 jobs in the state of Texas does not constitute "'work that exists in significant numbers in the national economy' as required under 20 C.F.R. § 404.1520." (Pl. Br. at 14).

At Step 5 of the sequential review process, it is the Commissioner's burden to show that a

claimant is capable of performing other gainful employment in the national economy. *Greenspan*, 38 F.3d at 236; 20 C.F.R. § 404.1520(a)(4)(i). According to the Code of Federal Regulations, "Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." 20 C.F.R. § 416.966(b). Jobs that are isolated and exist in only very limited numbers in relatively few locations outside of the region where a claimant lived would not qualify under this test. *Id*. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987)).

### 1. *Gainful Employment*

In the instant case, the ALJ considered testimony from a VE at the administrative hearing. The VE testified that Plaintiff was incapable of returning to her past relevant work as a sales clerk and that she did not have any transferrable skills. (Tr. at 333-34). Even though Plaintiff testified that her daily activities included embroidery, gardening, and making crafts, and that she did not have any problems with fine manipulation, the ALJ found that Plaintiff retained the RFC to push, pull, finger, feel, and handle only "occasionally." (*See* Tr. at 18, ¶6; Tr. at 313-14). The VE testified that the limitation of bilateral manual dexterity to "occasional" use significantly eroded the job base of unskilled sedentary jobs a hypothetical person with Plaintiff's RFC could perform so much that the VE could "only give [the ALJ] two examples of jobs." (Tr. at 334). VE then testified that someone with Plaintiff's RFC could perform work as a surveillance systems monitor, with 2,300 jobs in Texas and 33,000 jobs nationally, or as a call out operator, with 800 jobs in Texas and 11,000 in the

national economy.  (Tr. at 335).  The VE did not say whether the identified jobs were merely representative of a larger category of jobs.  *See id*.  To the contrary, the VE's statement that she could give "only" two examples suggested that the positions of surveillance systems monitor and call out operator comprised the exclusive set of jobs which someone with Plaintiff's RFC was capable.

Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding.  *See Selders*, 914 F.2d at 618. When Plaintiff's attorney asked whether the position of call out operator required Plaintiff to sit all day, the VE responded that it did not; rather, it was a true sit stand option but did require an attachment to a headset near the desk as well as keyboard typing to record the telephone conversations.  (Tr. at 336).  Plaintiff's attorney then asked the VE about the duties of a surveillance systems monitor.  *Id*.  The VE responded that the job duties associated with that position require the person to monitor security systems, call customers, and dispatch emergency services if necessary. (Tr. at 336-37).  The VE testified that the job required attentiveness and alertness; the VE also testified that an individual on narcotic pain medication might not be able to concentrate to the extent that it would be difficult for the person to perform the requirements of the position.  (Tr. at 337).

Based on the VE's testimony at the hearing and using the medical-vocational guidelines as a framework for decision making, the ALJ found that Plaintiff could perform work that exists in significant numbers in the national economy.  (Tr. at 19, ¶12).  Specifically, she found that Plaintiff could work as a call out operator or as a surveillance systems monitor; together, these two positions totaled 3,100 jobs in Texas.  *See id*.  The ALJ made this finding despite her recognition that Plaintiff

takes a number of prescription medications, including narcotic pain medication.[10] (*See* Tr. at 14-15). Since the VE testified that an individual on narcotic pain medication likely would have difficulty performing the duties of a surveillance system monitor, the Court finds that the ALJ's determination that Plaintiff could perform the duties of a surveillance systems monitor was not based on substantial evidence. (Tr. at 337); *Johnson*, 864 F.2d at 343-344. Accordingly, the position of surveillance systems monitor cannot support the ALJ's Step 5 determination that Plaintiff can perform gainful employment that exists in the national economy.

### 2. *Significant Number*

The ALJ's determination that Plaintiff was not disabled therefore rests on her finding that the 800 jobs available in Texas (and 11,000 nationally) as a call out operator constitutes a "significant number" for disability determination purposes. (*See* Tr. at 19, ¶12). The Fifth Circuit has not addressed what constitutes a "significant" number of jobs available in the national economy required for a finding of "not disabled" at Step 5 of the sequential evaluation process. However, a number of courts within the Fifth Circuit have considered the issue. In *Mercer v. Halter*, the magistrate judge found that although "there is no magic number determining when the number of jobs available is 'significant,'" 500 jobs in Texas (and 5,000 nationally) was significant for an individual with specialized transferrable skills he acquired from years of experience in the airline industry. 2001 WL 257842, at *6 (N.D. Tex. Mar. 7, 2001) (Bliel, J.) Another case from the Northern District of Texas found 3,750 jobs in Texas (and 55,000 nationally) as a machine tender

---

[10] Of the medications prescribed to Plaintiff by her treating physicians and identified by the ALJ in the body of her decision, Soma, Darvocet, and Vicodin are narcotic pain relievers. (Tr. at 14); *see* DRUG INFORMATION ONLINE, *available at* http://www.drugs.com (last visited Aug. 17, 2007).

(an unskilled sedentary position) to be significant.[11]  *Hollan v. Apfel*, 2001 WL 180151, at \*8 (Feb. 20, 2001) (Sanderson, J.) (citing Sixth, Eighth, Ninth, and Tenth Circuit case law).  However, the VE in *Hollan* also found the claimant capable of performing work as a surveillance systems monitor and as a diet clerk, so the number of jobs available to the claimant was greater than just the 3,750 jobs as a machine tender.  *See id*. at \*3.  Other district courts in Texas have factored the population of the state into their determination of what constitutes a "significant" number of jobs.  *Mericle v. Sec'y of Health and Human Servs.*, 892 F.Supp. 843, 847 (E.D. Tex. 1995) (when considering a variety of factors specific to the case, "eight hundred and seventy jobs in the entire State of Texas, now the second most populous state in the country, is not a 'significant number'") (citing *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir.1988)); *Walker v. Shalala*, 1994 WL 171209, at \*2 (S.D. Tex. Jan. 6, 1994) (1,800 jobs as a surveillance systems monitor in Texas and 18,000 nationally is not a significant number when considered as a percentage of the work force).

Outside of courts within the Fifth Circuit, a number of circuit courts have addressed the issue of what constitutes a "significant" number of jobs required for a showing of "not disabled" at Step 5.  The Eighth Circuit found 200 sedentary, unskilled jobs in Iowa to be significant, but the court also noted that the VE testified the number was "merely representative of a larger category of jobs" the claimant could perform.  *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997).  In another case from the Eighth Circuit, the court found 500 jobs in Missouri to be significant for a claimant capable of performing sedentary work and who had transferrable skills from 25 years as a security guard.  *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988).  In *Trimiar v. Sullivan*, the Tenth Circuit

---

[11]  The opinion in page 8 of *Hollan* refers to the total number of jobs as 37,500.  However, page 7 of the opinion says 3,750.  It appears from the context of the case that 3,750 is correct.

found three unskilled jobs that totaled 650 to 990 positions in Oklahoma to be significant; the court rejected drawing a bright line and affirmed its belief that each case should be evaluated on its individual merits. 966 F.2d 1326, 1330 (10th Cir. 1992). The Ninth Circuit found 1,266 jobs in California to be a significant number of jobs. *Barker v. Sec'y of Health and Human Servs.*, 882 F.2d 1474, 1479 (9th Cir. 1989); however, *Barker* reiterated the Ninth Circuit's rejection of geography and population as factors in whether a given number of jobs constitutes a significant number for purposes of disability determination. *Id.* (citing *Martinez v. Heckler*, 807 F.2d 771, 775 (9th Cir. 1986)). In a case from the Sixth Circuit, the Court of Appeals reversed a lower court's decision and reinstated the ALJ's finding that 1,350 jobs in the nine-county area around Dayton, Ohio was significant. *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir.1988). The Sixth Circuit explained that the level of the claimant's disability, the reliability of the vocational expert's testimony, the reliability of the claimant's testimony, the distance the claimant is capable of traveling to engage in assigned work, and the isolated nature of the offered positions all provided substantial evidence within the context of the case that the claimant was capable of performing work that exists in significant numbers in the national economy. *Id.*

It is clear from the relevant case law that no "magic number" exists as to what constitutes a "significant" number of jobs in the national economy for purposes of a Step 5 determination of disability. Courts have repeatedly rejected the application of a bright line and instead held that each case be evaluated on its individual facts. *See e.g.*, *Trimiar*, 966 F.2d at1330. Despite the nebulous nature of what is "significant," relevant case law provides a number of guideposts. In Texas, 1,800 jobs is not significant whereas greater than 3,750 jobs is significant for an unskilled sedentary

position.[12]  *See Walker*, 1994 WL 171209, at *2; *Hollan*, 2001 WL 180151, at *8.  Other courts in Texas have found less than 1,800 jobs to be significant for claimants with transferrable skills.  *See Mercer*, 2001 WL 257842, at *6.  Fewer that 1,800 jobs has been found to be significant in other circuits when the VE indicated that the number was "merely representative of a larger category of jobs" or restricted the finding to a specific geographic area within a state.  *Johnson*, 108 F.3d at 180; *see Hall*, 837 F.2d at 275.  Finally, district courts in Texas have considered the population and geography of the state to be relevant factors, and the Fifth Circuit has not precluded such a consideration.  *See Mericle*, 892 F.Supp. at 847; *Walker*, 1994 WL 171209, at *2; *but see Martinez*, 807 F.2d at 775.

In the instant case, the ALJ found that 800 unskilled sedentary jobs as a call out operator in Texas was a significant number.  Given the 1,800 (not significant) and 3,750 (significant) figures used by other courts in this circuit, the Court finds that this number is well below the threshold required to establish that a significant number of jobs exists that Plaintiff is capable of performing with her RFC.[13]  *See Walker*, 1994 WL 171209, at *2; *Hollan*, 2001 WL 180151, at *8.  Moreover, when the Court considers the population and geography of the state of Texas to be relevant factors, the ALJ's finding that 800 jobs is significant is even more untenable.  *See Mericle*, 892 F.Supp. at 847; *Walker*, 1994 WL 171209, at *2.  The Court emphasizes that it is not identifying a "magic

---

[12]  The rough guideline of 1,800 (not significant) to 3,750 (significant) for sedentary unskilled jobs in Texas likely understates both numbers because of population growth in the intervening years.  Census data indicates that the population of Texas grew by 12.7% in the time period from April 1, 2000 to July 1, 2006.  As such, both measures would currently constitute a smaller percentage of the overall labor market than in 2001, the year in which *Hollan* was decided.  U.S. CENSUS BUREAU, *State and County Quickfacts*.  *Available at* http://quickfacts.census.gov/qfd/states/48000.html (Last visited Aug. 17, 2007).

[13]Even if the Court were to find that substantial evidence supported the ALJ's determination that Plaintiff was capable of performing work as a surveillance systems monitor, this would bring the total to 3,100, which lies in between the 1,800 (not significant) and 3,750 (significant) guideposts established by other courts in this circuit.

number" for what constitutes "significant" for disability purposes.  Rather, the unique factual circumstances of the case direct the Court to determine that 800 jobs is not significant.[14]  As such, the Court finds that the ALJ's determination of disability is not supported by substantial evidence and the Commissioner has not met his burden at Step 5 to show that other gainful employment exists in the national economy that Plaintiff is capable of performing.  *Greenspan*, 38 F.3d at 236; 20 C.F.R. § 416.966(b).

### 3. Remedy

Having determined that the Commissioner did not meet his burden at Step 5 to show that Plaintiff was capable of performing a significant number of jobs in the national economy, the Court next considers whether remand is appropriate. Under the statute providing for judicial review of the Commissioner's decision, the Court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

Ordinarily, remand for rehearing would be appropriate to determine whether a significant number of jobs in the national economy exist that Plaintiff is capable of performing with her RFC. However, in the instant case, the VE testified that the ALJ's limitation of Plaintiff's bilateral manual dexterity to "occasional" use significantly eroded the base of available sedentary jobs.[15] (Tr. at 334). With the ALJ's limitation of "occasional," the VE could name "only" two examples of jobs at the

---

[14]Among these unique factual circumstances were: (1) Plaintiff's lack of transferrable skills and limitation to unskilled sedentary work; (2) the VE's "significant erosion" of the available job base; (3) the VE's statement that she could give "only" two examples of jobs; and (4) the lack of substantial evidence to support Plaintiff's ability to perform the duties of a surveillance system monitor.

[15]  Although it appears from the transcript that the ALJ's determination of Plaintiff's RFC is directly contradicted by Plaintiff's own statements regarding her manual dexterity, neither party raised the issue of RFC on appeal.  *See* Pl. Br.; Def. Br.; Tr. at 18, ¶6; Tr. at 313-14.  Since the Court cannot substitute its own judgment for that of the ALJ's, Plaintiff's RFC would remain the same on rehearing.  *Greenspan*, 38 F.3d at 236.

sedentary level with the RFC provided. (Tr. at 334). As discussed in Parts II.E.1 and II.E.2, *supra*, Plaintiff cannot perform the duties of a surveillance systems monitor, and the position of call out operator does not exist in significant numbers in the national economy to support a Step 5 determination of not disabled. It is therefore apparent from the transcript that a rehearing for the purposes of obtaining substantial evidence of jobs available in the national economy would be fruitless and result merely in the delay of awarding benefits. Accordingly, the Court finds that rehearing is not necessary and that the Commissioner should be directed to award disability benefits. *See Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992) (stating that remand to the Secretary would be unconscionable thus ordering the Secretary to award benefits).

## III.    RECOMMENDATION

For the foregoing reasons, the Court recommends that Plaintiff's motion for summary judgment be **GRANTED**, the *Commissioner's Motion for Summary Judgment* be **DENIED**, and the Commissioner's decision be **REVERSED**. The Court further **RECOMMENDS** that the Commissioner be ordered to award Plaintiff disability benefits with an onset date of October 1, 1999.

**SO RECOMMENDED** on this 24th day of August, 2007.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE